UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

National Railroad Passenger Corp., d/b/a Amtrak,

      Plaintiff,

v.                                                    Case No. 06-10135

City of Bloomfield Hills School District,      Honorable Sean F. Cox

      Defendant.
_____/

## OPINION & ORDER

This action arises out of a written release negotiated by the parties following a collision involving a train operated by Plaintiff National Railroad Passenger Corp. d/b/a Amtrak ("Amtrak") and a bus operated by Defendant City of Bloomfield Hills School District ("the District"). The matter is currently before the Court on the parties' cross-motions for summary judgment. The Court heard oral argument on January 18, 2007. As set forth below, the Court shall DENY Plaintiff's Motion for Summary Judgment and shall GRANT Defendant's Motion for Summary Judgment.

## BACKGROUND

On January 13, 2004, a train operated by Amtrak and a bus operated by the District collided ("the Collision"). The bus, that at the time contained only its driver, apparently drove through the crossing arms and collided with the train.

Following the Collision, Amtrak made a claim against the District for damage to its train and equipment. Amtrak made the claim through its Director of Rolling Stock Claims, Peter E.B.

1

Herron ("Herron").  Gallagher Bassett Services ("Gallagher Bassett") manages the insurance pool of which the District is a member and handled that claim on behalf of the District.  Gallagher Bassett representative Reinhardt Hasselbring ("Hasselbring") handled the claim on behalf of the District.  Amtrak claimed that it incurred $91,000 in property damages to its train and equipment and claimed that it incurred an additional $20,0000 for the loss of use of the locomotive.

By all accounts, negotiations then ensued between Herron and Hasselbring and the men ultimately agreed to a settlement in which the District would pay Amtrak the amount of $74,000.00 and Amtrak would execute a mutually agreed upon release.

Hasselbring was the first to propose a draft release.  (Ex. C to Def.'s Br.).  That release was titled "Release of all claims" and, among other things, provided that Amtrak released the District and Gallagher Bassett "of any known now or that may hereafter become known, including but not limited to, back pay, future pay, compensation for fringe benefits, personal injuries, loss of earnings, loss of earning capacity of potential, pain and suffering, expense of every kind, and future aggravation or existing conditions."  (*Id.*).

Herron reviewed the proposed release, but was unwilling to sign it.  (Herron Dep. at 80).  Herron testified that he thinks he called Hasselbring and said, "I can't sign this release. It's a general release of all claims, and we're only dealing with the property damage here. . . why don't you send me a property damage release?"  (Herron Dep. at 81).  Herron states that when Hasselberg stated that he did not have one, Herron offered to send him a proposed release.  (*Id*. at 81-82).

Herron then sent Hasselbring a release he had used in another case, along with an e-mail explaining, "[h]ere is a release that says what it means.  Let me know and I will prepare [one] for

2

our case." (Ex. E to Def.'s Br.). Herron later sent Hasselberg a proposed release that was

specific to the case. (Ex. F.) That proposed release was titled "Release for Property Damage"

and stated that Amtrack released the District and Gallagher Bassett "from all claims, demands,

damages, actions and causes of action for all property damage costs and associated costs to Train

#353 more particular, Unit 90222, and including but without limitation of the foregoing, all

liability for damages, costs, and expenses to the above equipment of any kind, nature or

description now existing or which may hereafter arise from or out of damages, known or

unknown, permanent or otherwise, sustained or received by the above equipment at or near

Bloomfield Hills, MI on or about January 13, 2004." (*Id*.). It also included the following:

> IT IS UNDERSTOOD AND AGREED THAT THIS IS A FULL AND FINAL
> RELEASE FOR PROPERTY DAMAGE TO THE ABOVE EQUIPMENT AND
> THAT PAYMENT OF THE ABOVE STATED CONSIDERATION IS NOT AN
> ADMISSION OF LIABILITY.

(*Id*.).

Hasselbring responded to the proposed release in a November 10, 2004 e-mail that

stated,"As you know, I had our defense counsel review your release. Please find attached a copy

of the release, which was prepared by our defense counsel. Give me a call if there are any

problems." (Ex. G to Def.'s Br.). Attached, was the form of release that was ultimately executed

by Amtrack. (*Id*.).

Herron responded to Hasselbring's revised release by stating, "That's even simpler and to

the point!  Will get it out today." (*Id*.). Herron executed the release on November 10, 2004 and

then returned it to Hasselbring. The one-page executed release ("the Release") states as follows:

<u>RELEASE</u>

The **National Railroad Passenger Corporation** (including its employees, agents,

3

successors and assigns), in consideration of $74,000.00, the receipt and sufficiency of which is acknowledged, hereby releases the **Bloomfield Hills School District** and **Gallagher Bassett Services, Inc.** (including their employees, agents, successors and assigns) of and from any and all claims, demands, damages, actions and causes of action whatsoever, whether known or unknown, arising from or relating to a collision between Train #353 (more particularly Unit 90222) and a **Bloomfield Hills School District** bus on January 13, 2004.  The **National Railroad Passenger Corporation** also agrees to indemnify the released parties, and hold them harmless, for the released claims.

**IT IS UNDERSTOOD AND AGREED THAT THIS IS A FULL AND FINAL RELEASE FOR PROPERTY DAMAGE TO THE ABOVE EQUIPMENT AND THAT PAYMENT OF THE ABOVE STATED CONSIDERATION IS NOT AN ADMISSION OF LIABILITY.**

(Ex. A to Compl.)(emphasis in original).

Herron testified that he did not speak to anyone at Amtrak about the proposed revised release prior to signing it, such as counsel, and that he had authority to sign the release.  (Herron Dep. at 98).  Herron testified that he fully read the revised release before he signed it, he fully understood the content of the document, and that he had no questions regarding the meaning of the document.  *(Id*. at 94-95).

Herron was not aware at the time that he executed the release that Amtrack engineer Charles Allen ("Allen") was claiming that he was injured in the Collision.  (Herron at 99-100). Hasselbring was also unaware of Allen's alleged injuries. (Hasselbring Dep. at 23).

It is undisputed that after Hasselbring received the executed Release from Herron, the District paid Amtrak $74,000.00.

On November 23, 2005, Allen, the Amtrak engineer who was operating the train at the time of the collision, sued the District in state court claiming that the District is liable for personal injuries he sustained in the Collision ("the Allen Suit"). (*See* Compl., attached to Pl.'s

4

Br. as Ex. 11).   Shortly, thereafter, the District sent Amtrak a letter advising of the Allen Suit

and its belief that Amtrak is required to indemnify the District.  (Ex. 10 to Pl.'s Br.).  The District

notified Amtrak that it was tendering the defense of the Allen Suit and seeking written

confirmation of Amtrak's obligation to indemnify the District.

Amtrak refused to indemnify the District, and commenced this action.  Amtrak's nine-

count complaint:

> 1) seeks a declaration that the Release, by its terms, is limited to the property
> damage sustained by Amtrak and does not require Amtrak to indemnify the
> District as to other claims, including the Allen Suit (Count I, "Request for
> Declaratory Relief");
>
> 2) alternatively requests that the Court reform the Release due to fraud and
> mistake (Count II, "Reformation: Fraud and Mistake"); and
>
> 3) alternatively seeks rescission on various grounds (Count III, "Rescission:  Lack
> of Capacity/Authority"; Count IV, "Rescission: Lack of Mutual Assent"; Count V,
> "Rescission: Mutual Mistake"; Count VI, "Rescission: Unconsionability"; Count
> VII, "Rescission: "Innocent Misrepresentations"; Count VIII, "Rescission: Silent
> Fraud"; and Count IX, "Rescission: Insufficient/Inadequate Consideration")

(Pl.'s Compl.)

The District then filed a counterclaim, asserting that Amtrak has breached the parties'

contract by refusing to indemnify the District in the Allen Suit.  The District requests that the

Court declare that Amtrak has a duty to indemnify the District in the Allen Suit, and reimburse

the District for all attorney fees, costs, settlement and/or judgment in the Allen Suit.

The parties have both filed cross-motions for summary judgment, pursuant to FED. R.

CIV. P. 56 (c).

<u>Standard of Decision:</u>

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

5

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 (c).  The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admission on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

<u>ANALYSIS</u>

A.    <u>The Release Is Clear And Unambiguous And Requires Amtrak To Indemnify The District With Respect To The Allen Suit.</u>

Under Michigan law, the purpose of contract interpretation is to ascertain the intention of the parties.  Whenever possible, the parties' intent is to be discerned from "the language in the contract, giving it its ordinary and plain meaning as such would be apparent to a reader of the instrument." *Wilkie v. Auto-Owners Ins. Co.*, 469 Mich. 41, 47-48 (2003).

Thus, "[t[he scope of a release is controlled by the language of the release." *Kellogg Company v. Sabhlok*, __ F.3d __ (6th Cir. 2006)(citing *Adair v. State*, 470 Mich. 105, 127 (2004)).  "If the language of the release is unambiguous, it must be construed as written." *Id.* The fact that the parties dispute the meaning of a release does not, in itself, establish an ambiguity.  Rather, a release is ambiguous only if its language is reasonably susceptible to more than one interpretation.  *Id.*

6

Moreover, a court should read the release as a whole and give meaning to all the terms contained within. *Century Surety Co. v. Charron*, 230 Mich.App. 79, 82 (1998); *Wilkie*, 469 Mich. at 50 ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase."); *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 457 (1976)(An interpretation derived from a reading of the contract as a whole is preferred to an interpretation taken from a reading of a single provision in isolation).

The Michigan Supreme Court has explained that a "fundamental tenet of our jurisprudence is that unambiguous contracts are not open to judicial construction and must be *enforced as written*." *Rory v. Continental Ins. Co.*, 473 U.S. 457, 468 (2005)(emphasis in original). Accordingly, "[a]bsent an ambiguity or internal inconsistency, contractual interpretation begins and ends with the actual words of a written agreement." *Universal Underwriters Ins. Co.*, 464 Mich. 491, 496 (Mich. 2001).

Here, both parties agree that the terms of the Release are clear and unambiguous. Each party, however, asserts that the terms of the Release require a judgment in its favor.

Amtrak asserts that "when read as a whole, the clear and unambiguous language of the Release executed on November 10, 2004 provided that Amtrak was releasing only its property damage claim arising out of the bus/train collision of January 13, 2004." (Pl.'s Br. at 11). Amtrak contends that this is so because the Release contains the following language: "IT IS UNDERSTOOD AND AGREED THAT THIS IS A FULL AND FINAL RELEASE FOR PROPERTY DAMAGE TO THE ABOVE EQUIPMENT AND THAT PAYMENT OF THE ABOVE STATED CONSIDERATION IS NOT AN ADMISSION OF LIABILITY." Amtrak contends that the above "specific language" controls "the more general release language of 'any

7

and all claim, demands, damages, actions and causes of action whatsoever, whether known or unknown,' found in the body of the Release." (*Id*.).

Amtrak also asserts such an interpretation "honors the intent of the parties" as shown by the testimony of Herron and Hasselbring. Amtrak selectively cites portions of Hasselbring's testimony in its brief and claims that he testified that his intent was that the release only cover the property damage. It further asserts that the District "is bound by the admissions of its agent, Mr. Hasselbring, who unequivocally testified the settlement agreed upon by Amtrak and the School District (embodied in the November 10, 2004 Release) concerned only Amtrak's property damage claim." (Pl.'s Br. at 12). Such assertions by Amtrak, however, fail to acknowledge that Hasselbring testified as follows:

> Q.    What is your understanding as to the intent of the release document executed by Mr. Herron?
>
> A.    At that particular time it was for the property damage. We were not aware of any other injury.
>
> Q.    When you say at that time, did the intent change at some point?
>
> A.    I'm saying I know now that the individual was injured. At that particular time I did not.
>
> Q.    But at the time the release was sent to Mr. Herron, it was your intent that the scope of the release would be the property damage claim?
>
> A.    The property damage and if anything ever came further, you know, if anything presented itself down the road, it was to protect the client.
>
> Q.    That's what you believe the intent, the scope of the release was?
>
> A.    That's why I had counsel review it.

(Hasselbring Dep. at 23).

8

The District contends that the Release is clear and unambiguous and entitles it to relief.  It explains that it "does not dispute that the Release is for property damage to Amtrak's equipment as stated therein in bold-type capital letters.  It is not, however, a release exclusively for property damage to Amtrak's equipment, and by its express terms extends beyond property damage to 'any and all claims, demands damages, actions and causes of action whatsoever, whether known or unknown, arising or relating to' the January 13, 2004 train/bus collision."  (Def.'s Br. at 3-4).  The District notes that had the parties wished to limit the scope of the release to property damage claims only, they could have easily done so.

The District asserts that the Allen Suit arises from and relates to the Collision and therefore, by the clear and unambiguous terms of the Release, the Allen Suit is one of the released claims for which Amtrak must indemnify the District and hold it harmless.  It therefore asserts that it is entitled to summary judgment with respect to Count I of Amtrak's complaint and on its counterclaim.

The Court agrees with the District that the terms of the Release are clear and unambiguous, and under Michigan law, must be enforced as written.  *Rory, supra.*

The party providing the release is expressly defined in the Release as "The National Railroad Passenger Corporation (**including its employees**, agents, successors and assigns)" and it agreed to broadly release the District "of and from **any and all claims, demands, damages, actions and causes of action whatsoever, whether known or unknown, arising from or relating to**" the Collision.  By the express terms of the Release, Amtrak further agreed to indemnify the released parties, the District and Gallagher Bassett, and hold them harmless, for the released claims."  It is undisputed that Allen is an Amtrak employee and that the Allen Suit

9

arises from and relates to the Collision.  Accordingly, Amtrak is required to indemnify the District.

Plaintiff's proposed interpretation is simply not reasonable and ignores the well established rule that a contract must be read as a whole so that meaning is given to all of its terms.  *Wilkie*, 469 Mich. at 50 ("We read contracts as a whole, giving harmonious effect, if possible, to each word and phrase.")  Plaintiff's interpretation would require that the bolded provision be read in isolation and would render superfluous and nugatory several material terms of the Release.

First, it would render the definition of Amtrak as "(including its employees, agents, successors and assigns)" as superfluous.  There would be no need to define Amtrak as including its employees if the release were restricted to the property damage to the train because Amtrak, and not its employees, owns the train at issue and would be the only party able to assert such a claim.  Second, and more importantly, Plaintiff's strained interpretation would render the description of the released claims in the body of the release superfluous:  "**any and all claims, demands, damages, actions and causes of action whatsoever, whether known or unknown,** arising from or relating to a collision between Train #353 (more particularly Unit 90222) and a Bloomfield Hills School District bus on January 13, 2004."  If Amtrak were releasing only its claims for property damage, the above language would be unnecessary.  Indeed, Amtrak's interpretation would require that the Court ignore or disregard that broad release language.

The Release purports to release all claims, whether known or unknown, and then contains specific language regarding one claim that was known by the parties at that time.  The bolded language regarding property damage does not restrict the Release to only that claim.  All of the

10

Release's provisions must be read together.

Accordingly, the Court concludes that, based on the clear and unambiguous terms of the Release, Amtrak is required to indemnify the District with respect to the Allen Suit.  The District is therefore entitled to summary judgment with respect to Count I of Amtrak's Complaint and with respect to the District's Counterclaim.

B.    Amtrak Is Not Entitled To Reformation Of The Release.

"To obtain reformation, a plaintiff must prove a mutual mistake of fact, or mistake on one side and fraud on the other, by clear and convincing evidence."  *Casey v. Auto Owners Ins. Co.*, __ Mich. App. __ (Sept. 21, 2006).  "A unilateral mistake is not sufficient to warrant reformation."  *Id.*  In addition, a "mistake in law – a mistake by one side or the other regarding the legal effect of an agreement – is not a basis for reformation."  *Id*.

Alternatively, Amtrak requests reformation of the release to correct a "mutual mistake of the parties," relying on *Sobel v. Steelcraft Piston Ring Sales, Inc.*, 294 Mich. 211, 217 (1940). Amtrak acknowledges that it is its burden to establish the mutual mistake and that the evidence must be clear and convincing and must establish beyond cavil the right to reformation.  Amtrak submits that the testimony of Herron and Hasselbring establishes that both parties intended the Release to cover only the property damage to the train.

Amtrak also asserts it is entitled to reformation of the Release "to address the obvious 'inequitable conduct' of the School District in attempting to expand the terms of the Release to include personal injury, relying on the following language in *Retan v. Clark* , 220 Mich. 493, 496 (1922):

There is, however, still another class of cases – that where one party to an

11

> instrument has made a mistake and the other party knows it and conceals the truth
> from him.  Such inequitable conduct accompanying a mistake is generally held to
> be sufficient grounds for reformation of the instrument in question.

Amtrak accuses the District of "sharp practices," that would justify reformation under *Retan*, in

that Hasselbring did not advise Herron that the revised release included personal injury claims.

The District contends that Amtrak has no factual support to support its claim for

reformation of the Release.  It asserts that the evidence establishes that the parties freely

negotiated the release, exchanged various proposed forms of a release, and ultimately agreed on

the final form.  It asserts that Hasselbring was "wholly forthcoming as to the authorship of the

revised release" and that Mr. Herron signed this release "with his eyes wide open."

The Court concludes that Amtrak cannot sustain its burden of establishing by clear and

convincing evidence that there was a mutual mistake of fact.  Rather, Herron was simply

unilaterally mistaken about the legal effect of the Release that he agreed to.

In addition, Amtrak cannot establish any inequitable conduct by the District that would

warrant reformation.  Hasselbring advised Herron that his legal counsel had revised the Release

and provided the proposed revised release to Herron for his review.  Herron reviewed the one-

page Release, which conspicuously had the title changed from "Release for Property Damage" to

"Release" contained very broad release language in the body of the release, and contained a

definition of Amtrak that included its employees.  Amtrak has provided no authority whatsoever

to support its apparent position that Hasselbring had a duty to advise Herron, a sophisticated

party who had negotiated and signed numerous releases during his career, of the legal effect of

the significant and conspicuous revisions that he proposed on behalf of his client.

Accordingly, the Court concludes that Defendant is entitled to summary judgment with

12

respect to Count II of Amtrak's Complaint.

C.      Amtrak Is Not Entitled To Rescission.

        "A contract may be rescinded because of a mutual misapprehension of the parties, but this

remedy is granted only in the sound discretion of the court." *Lenawee County Bd of Health v.*

*Messerly*, 417 Mich. 17, 26 (1982). "A court need not grant rescission in every case in which the

mutual mistake relates to a basic assumption and materially affects the agreed performance of the

parties." *Id*. at 31. "[R]escission is indicated when the mistaken belief relates to a basic

assumption of the parties upon which the contract is made, and which materially affects the

agreed performances of the parties." *Id.* at 29. "Rescission is not available, however, to relieve a

party who has assumed the risk of loss in connection with the mistake." *Id*. at 31.

        In addition, as recognized by the Sixth Circuit in *R.E. Dailey & Co.*, Michigan law

provides that a party must tender back the consideration it had received under the agreement

prior to seeking its rescission. *R.E. Dailey & Co. v. John Madden Co., Ltd.*, 1 F.3d 1242, *9 (6th

Cir. 1993). In that case, the court noted that "Michigan law has not wavered from traditional

maxims:

        Rescission, whether legal or equitable, is governed by equitable principles, one of
        which is that an essential prerequisite to the receipt of such relief is the return of
        what has been received, or its equivalent, by him who seeks the remedy.

*Id.* (quoting *Carey v. Lauhoff*, 310 Mich. 195 (1942)). That is, "[t]o free itself from a contract

claiming rescission, a plaintiff must tender all it has received by that contract, and place the entire

matter in the hands of the court for equitable resolution. Were this not required, [a] plaintiff

would be able to 'take his chances of recovering in [the rescission] action without running the

risk of losing what he has received in case he is defeated.'" *Id.* (quoting *Carey v. Levy*, 329 Mich.

13

458 (1951)).

Thus, a plaintiff's failure to "ante up the money it received" under a the challenged agreement "dooms its claim for rescission."  *R.E. Dailey & Co., supra*, at *9.  "Michigan courts recognize only two exceptions: one, where the defendant has waived this duty," and "two, in the case of fraud in the execution."  *Id*. (citing *Stefanac,* 435 Mich. 155, 163 (1990) ).

The District contends that while all of Amtrak's numerous counts seeking rescission fail because they lack any factual support, the Court need not even reach those issues because it is undisputed that Amtrak has not tendered back the $74,000 that the District paid to Amtrak under the challenged Release and all of its rescission claims therefore fail as a matter of law.

In its opening brief, Amtrak ignores the fact that it did not tender back the $74,000 it received from the District prior to, or contemporaneous with, the filing of this action.  In its Response to the District's Motion, it asserts that the fraud in the execution exception should apply here.  In support of that argument, Amtrak asserts that Mr. Herron "was never told he was executing a release of the nature and magnitude suggested by defendant."  (Pl.'s Resp. at 7). Amtrak states that Herron "was never advised that he was signing (over his previous objection) a release that required Amtrak to indemnify and harmless the School District from any personal injury claim arising from the collision."  (*Id*.).  It also asserts -- without citation to any deposition testimony or other record evidence – that "Mr. Herron was consistently assured by Mr. Hasselbring the parties were resolving only Amtrak's property damage claim."  (*Id*.).  Amtrak further asserts that the District "conceded" that "Mr. Herron, the signatory of the Release, was told the instrument 'really didn't mean what it clearly said.'"  Again, no record evidence was

14

identified to support that assertion.[1]

The Court finds that Amtrak has not submitted any record evidence to establish that the fraud in the execution exception to the tender back rule applies in this case.  All of Amtrak's rescission claims (Counts III through IX) therefore fail as a matter of law.

<u>CONCLUSION & ORDER</u>

For the reasons set forth above, **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment [Docket Entry No. 43] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [Docket Entry No. 42] is **GRANTED**.   Plaintiff's Complaint is therefore **DISMISSED WITH PREJUDICE** and the Court **DECLARES** that the Release requires Amtrak to indemnify the District with respect to the Allen Suit.

The Court further directs counsel to confer in order to agree upon, and submit to the Court, a proposed final judgment in this matter, given the Court's above rulings.  The status of such discussions shall be reported to the Court in writing on February 26, 2007.  If the parties cannot agree upon the language of the final judgment, the Court will issue an order requiring the submission of proposed final judgments, and briefs in support of same.

**IT IS SO ORDERED**.

                                         S/ Sean F. Cox
                                         SEAN F. COX
Dated: February 12, 2007                 UNITED STATES DISTRICT COURT JUDGE

---

[1]At the January 18, 2007 hearing, counsel for Amtrak identified portions of Hasselbring's deposition transcript (*i.e.*, pages 7, 23 and 73) that he believes supports these assertions.  The Court, however, does not agree that Hasselbring's testimony supports these assertions.

15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

National Railroad Passenger Corp., d/b/a Amtrak,

      Plaintiff,

v.                                         Case No. 06-10135

City of Bloomfield Hills School District,      Honorable Sean F. Cox

      Defendant.

_____/


**PROOF OF SERVICE**

The undersigned certifies that the foregoing order was served upon counsel of record via the Court's ECF

System and/or U. S. Mail on February 12, 2007.

                                       s/Jennifer Hernandez
                                       Case Manager to
                                       District Judge Sean F. Cox